UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DARREN SISTRUNK, | ) | CASE NO. 1:17-cv-1771 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |
| | ) | |

## I.  Introduction

Plaintiff, Darren Sistrunk, seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for supplemental security income and disability insurance benefits under Titles II and XVI of the Social Security Act ("Act").  The parties have consented to my jurisdiction.  ECF Doc. 11.

Because statements found in the ALJ's decision and the record evidence support a finding that Sistrunk failed to prove he met Listing 1.04, the ALJ's Step Three findings must be affirmed.  However, because the ALJ did not state good reasons for rejecting the treating physician's opinion, the final decision of the Commissioner must be VACATED and the claim must be REMANDED for further proceedings.

## II.  Procedural History

On November 29, 2011, Sistrunk applied for disability insurance benefits and supplemental security income, alleging disability beginning February 1, 2007.  (Tr. 399-404, 406-411)  The claims were denied initially and on reconsideration.  (Tr. 218- 229, 230-241, 242-

255, 257-270)  Sistrunk requested a hearing on October 19, 2012.  (Tr. 312)  Administrative Law

Judge ("ALJ") Susan G. Giuffre heard the case on June 12, 2013 (Tr. 181-216) and found

Sistrunk was not disabled.  (Tr. 271-283)  After Sistrunk's request for review (Tr. 377), the

Appeals Council vacated the ALJ's 2013 decision on February 9, 2015, and remanded the matter

to ALJ Giuffre to conduct further proceedings.  (Tr. 287-291)

Following the remand order, ALJ Giuffre held a second hearing on May 27, 2015 (Tr.

150-179) and issued a second unfavorable decision on July 1, 2015.  (Tr. 8-21)  The Appeals

Council denied further review, rendering the ALJ's decision final.  (Tr. 1-4)  Sistrunk instituted

this action to challenge the Commissioner's final decision.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Sistrunk was born on December 18, 1961 and was 53 years old when the ALJ issued her

2015 decision.  (Tr. 399)  He completed high school and attended vocational school to become

an electronics technician, but dropped out because the coursework was too difficult for him.  (Tr.

185)  For many years, he worked for the Zircoa Company in several different production jobs as

well as cleaning and maintenance.  (Tr. 186-187)  He had not worked since his alleged 2007

onset date.  He lived with his mother and helped care for her until she died in 2011.  (Tr. 204-

206)

### B.    Medical Evidence

Eulogio Sioson, M.D., examined Sistrunk on January 23, 2012 at the request of the State

Disability Determination Service ("DDS").  (Tr. 501-507)  An x-ray ordered by Dr. Sioson

showed degenerative changes consisting of severe disc space narrowing and endplate osteophyte

formation at the L4-5 level and hypertrophic facet changes at the L4-5 and L5-S1 levels.  (Tr. 501)

Sistrunk established care with Erron Bell, D.O. on May 15, 2012.  Sistrunk reported he'd had back pain for four years.  Dr. Bell reviewed Sistrunk's x-rays from January.  (Tr. 512)  Dr. Bell noted reduced range of motion in Sistrunk's back.  Sistrunk's extremities were normal; his muscle strength was intact; and his spine range of motion was normal.  After diagnostic testing, Dr. Bell diagnosed elevated blood pressure and prescribed medication.  He also referred Sistrunk to pain management.  (Tr. 514)  Sistrunk followed-up with Dr. Bell on May 31, 2012.  He had been feeling well since his last appointment and his blood pressure was normal.  (Tr. 553)

On July 31, 2012, Sistrunk established care with Zachary Allred, D.O. at the pain management department of Metro Health Medical Center.  (Tr. 524)  Sistrunk described his pain as sharp and stabbing; as having lasted for the past year; and as being alleviated by rest and stretching.  (Tr. 524)  He told Dr. Allred that he had been fired from his job several years ago for drug abuse issues.  He said he was trying to get disability benefits but would also be happy if his back pain improved and he could return to work.  (Tr. 525)  Sistrunk said that he could ambulate and perform daily activities without devices.  Dr. Allred found Sistrunk's pelvis to be asymmetric, elevated to the right side.  Sistrunk had mild tenderness to palpation in the left lumbosacral muscles.  Allred did not observe any spasms or trigger points and straight leg raise testing was negative.  (Tr. 526)  Dr. Allred diagnosed low back pain secondary to facet arthropathy.  He told Sistrunk that physical therapy and a home exercise program were the key for his back rehabilitation.  Sistrunk was hesitant to pay the five dollar copay for physical therapy.  He also seemed hesitant to do the home exercise program but accepted it.  Dr. Allred

told Sistrunk that he would not qualify for disability because he had not undergone any treatment or rehabilitation for his low back pain. (Tr. 527)

Sistrunk went to the emergency room at South Pointe Hospital on November 12, 2012. (Tr. 569) He reported pain down his right leg and buttock and down the posterior thigh. He said that the pain had started five to seven days earlier. He said he had no back pain. He had normal range of motion, strength and reflexes. (Tr. 570) Straight leg raising was negative. (Tr. 571) He was diagnosed with sciatica of the right side. (Tr. 572)

Sistrunk began pool-based physical therapy on December 18, 2012. He complained of constant low back pain which radiated down the right lower extremity to the toes, with left-sided low back and knee pain. (Tr. 607) On December 20, 2012, the therapist noted that Sistrunk had elevated blood pressure and sent him to the emergency room. (Tr. 593) Sistrunk was discharged from physical therapy on March 13, 2013 because he had not achieved his treatment goals. (Tr. 608)

On December 20, 2012, Sistrunk went to the hospital with elevated blood pressure. He also reported blurry vision and back pain but said these were chronic and no worse than usual. (Tr. 575) Sistrunk had normal strength and no sensory deficits. (Tr. 577) He was instructed to follow up with his primary care physician. (Tr. 577)

On January 2, 2013, Sistrunk met with Nathan Tracey, D.O., to follow-up on his high blood pressure. (Tr. 578) Sistrunk also reported chronic back pain. He had normal range of motion, gait, coordination, and muscle tone. (Tr. 579-580) Dr. Tracey prescribed medication for Sistrunk's high blood pressure and recommended diet and regular aerobic exercise. (Tr. 580) Sistrunk followed-up with Dr. Tracey on January 25, 2013. He said his diet was healthy but he

was not exercising due to back pain. (Tr. 582) Sistrunk had normal muscle tone and gait. Dr. Tracey continued his medications and recommended regular aerobic exercise. (Tr. 584)

On February 19, 2013, Sistrunk went to the emergency room at South Pointe Hospital complaining of low back pain. He was diagnosed with lumbosacral neuritis. (Tr. 591)

On March 27, 2013, Sistrunk started treating with Euglok Yap, M.D. Dr. Yap administered a lumbar epidural steroid injection. (Tr. 617) He administered a second injection on April 17, 2013. (Tr. 58)

On April 1, 2013, Sistrunk saw William Welches, D.O. for pain management. Sistrunk reported low back pain travelling down his left leg. (Tr. 622) He reported poor sleep habits and two hours of uninterrupted sleep each night. (Tr. 622) Sistrunk told Dr. Welches that osteopathic manipulative therapy ("OMT") had not helped his pain. He rated his low back pain as ranging from 5 to 8/10 with numbness and tingling into his legs. (Tr. 623) Dr. Welch performed OMT on April 1, 2013 but indicated that further OMT treatments were unwarranted because of lack of progress. He recommended that Sistrunk should further investigate epidural injections, which had provided temporary relief. (Tr. 625)

Sistrunk met with Dr. Tracey on April 10, 2013 for hypertension and back problems. (Tr. 587) Dr. Tracey noted that Sistrunk was treating with pain management and had received multiple shots. (Tr. 587) Sistrunk complained of spasms or cramps in his leg. (Tr. 587-588) He had normal coordination, gait, and muscle tone. Dr. Tracey noted that Sistrunk was depressed – he felt like his back wouldn't heal or stop hurting. (Tr. 589)

Sistrunk saw Dr. Tracey on July 11, 2014. He complained that his lower back pain was worse than the prior year. The pain radiated down his left leg and he was having difficulty sleeping. He also complained of leg weakness and decreased sensation in his leg. Physical

therapy and injections had provided minimal relief.  Sistrunk had 3/5 strength in his left hip

flexor, 3/5 strength in his left knee and 4/5 strength in his left foot.  He had 5/5 strength in his

right lower extremity.  He had decreased sensation to palpation at the lateral aspect of the lower

leg, but normal muscle tone.  (Tr. 628)  Sistrunk requested pain medication.  (Tr. 627)  Dr.

Tracey diagnosed spondylolisthesis of the lumbar region, lumbar degenerative disc disease and

hypertension.  He prescribed pain medication and recommended that Sistrunk lose weight.  (Tr.

629)  In a follow up visit on July 25, 2014, Sistrunk told Dr. Tracey his back pain was the same.

He had normal muscle tone, gait and range of motion.  He had reduced strength in his hips.  (Tr.

636)  Dr. Tracey ordered an MRI of Sistrunk's lumbar spine.  (Tr. 637)

Sistrunk started treating with Patrick Shaughnessy, M.D., at South Pointe Physical

Medicine Clinic on August 13, 2014.  Sistrunk reported that he'd had a sports injury in 1980 but

his back pain became worse five years ago.  He told Dr. Shaughnessy that he spent ten hours a

day reclining.  (Tr. 642)  Physical examination showed decreased strength in the left lower

extremity from -4 to 4 out of 5 at the hip and knee.  Dr. Shaughnessy also noted a loss of

sensation on the left in an S1 distribution.  Straight leg raising test was positive on the left.  (Tr.

644)  Dr. Shaughnessy prescribed pain medication and recommend daily walking and weight

loss.  He thought that Sistrunk was a "candidate for SSI" and that surgery might be an option.

(Tr. 645)

A lumbar MRI on August 19, 2014 showed a grade I anterolisthesis of L4-5 and a grade I

retrolisthesis of L5-S1.  There were mild superior and inferior endplate compression deformities

of all lumbar vertebrae and a remote bilateral L4 pars defect.  At L3-4, there was moderate-to-

severe canal stenosis due to hypertrophic facet changes as well as developmental shortening.

The L4-5 interspace was noted to be severely narrowed with degenerative endplate changes and

a left-sided disc bulge. The MRI revealed "suspected impingement" of the L4 nerve root. At L5-S1, there was severe disc space narrowing with disc bulge to the right, and endplate degenerative changes with minimal encroachment on the ventral thecal sac, but with moderate right and mild left foraminal narrowing. (Tr. 697)

Sistrunk saw Virginia Factor, D.O. on August 19, 2014 in the Family Practice Department at the Cleveland Clinic. Dr. Factor checked Sistrunk's hypertension and completed paperwork for an RTA paratransit pass so Sistrunk would have direct transportation; walking to the bus stop aggravated his pain. (Tr. 647)

Sistrunk followed up with Dr. Shaughnessy on September 3, 2014. Sistrunk complained of pain radiating down both legs. His pain was worse than his last visit and rated as 6/10. Sistrunk reported that his legs would occasionally "go weak." (Tr. 652-653) Dr. Shaughnessy noted bilateral decreased ankle jerk reflexes. Straight leg raising was negative for radicular pain but caused back and hip pain. Sistrunk had limited range of motion in his back due to pain, but full range of motion in his extremities and 4/5 strength in his hips. His gait was abnormal; he leaned forward and he would not heel or toe walk or perform tandem gait. Romberg's sign was equivocal. (Tr. 653) Dr. Shaughnessy diagnosed spondylolisthesis, spondylolysis and radiculopathy. He noted that Sistrunk's symptoms were consistent with his physical exam and MRI findings. He recommended a conservative approach and that Sistrunk pursue disability. He also recommended that Sistrunk be evaluated for possible surgery but noted that he would be reluctant to pursue surgery in the absence of progression of muscle weakness. Dr. Shaughnessy opined that it was extremely unlikely that Sistrunk's condition would improve; he expected it to stay the same or slowly deteriorate. (Tr. 654) Dr. Shaughnessy recommended that Sistrunk walk

as much as he was able and that he limit his lifting to no more than 10 pounds, with no bending to lift.  (Tr. 655)

On September 12, 2014, Sistrunk followed up with Dr. Tracey for his high blood pressure.  (Tr. 656)  He had adjusted his diet and decreased his portion sizes.  He was in pain management for his back pain.  He told Dr. Tracey that he was not planning to pursue surgery until the pain management was no longer dealing with his pain.  He had tenderness in his back on palpation.  (Tr. 657)

Sistrunk followed up with Dr. Shaughnessy on October 1, 2014.  He said that his back pain had not changed since the prior visit.  Sistrunk reported that he had walked ½ to ¾ mile several times.  It was painful and he rested at bus stops along the way.  (Tr. 664)  Straight leg raising was negative.  Sistrunk had full range of motion in his extremities.  His lower back was painful to palpation.  (Tr. 665)  Dr. Shaughnessy noted that Sistrunk "appears disabled."  (Tr. 666)  He diagnosed right L5 neuritis and recommended that he continue his medication and walking routine.  (Tr. 666-667)

Sistrunk told Dr. Tracey that his back was really bothering him on October 13, 2014.  The pain had started when he woke up that morning.  (Tr. 668)  Sistrunk had normal muscle tone.  Dr. Tracey noted that his blood pressure was under good control.  (Tr. 669)

On January 5, 2015, Sistrunk met with William Lang, D.O.  Sistrunk said he had fallen at church and landed on his tailbone.  (Tr. 674)  On examination, Sistrunk had tenderness in his low back.  Straight leg raise was positive on the left side.  He had normal reflexes.  Dr. Lang told Sistrunk to ice his back and recommended regular aerobic exercise.  (Tr. 676-677)

Sistrunk met with Dr. Shaughnessy for pain management on January 7, 2015.  He said his pain was worse than the last visit.  He had not made an appointment with a surgeon yet.  (Tr.

681)  Sistrunk reported pain in his tailbone from his fall.  (Tr. 682)  Straight leg raise was

negative.  He had limited range of motion in his back and full range of motion in his extremities.

He had 4/5 strength in his lower extremities.  (Tr. 682)  Dr. Shaughnessy ordered an x-ray of

Sistrunk's sacrum.  (Tr. 683)  The x-ray showed that the sacroiliac joints were maintained; there

was mild offset of segments at the distal coccyx suggesting a remote fracture.  No acute fracture

was identified but the x-ray showed degenerative changes of the lumbar spine.  (Tr. 696)  Dr.

Shaughnessy wrote that Sistrunk was unable to work in a competitive work setting.  (Tr. 683)

On June 10, 2015, Dr. Shaughnessy completed a pain questionnaire.  (Tr. 702-704)

  **C.**  **Opinion Evidence**

    **1.**  **Treating Physician - Dr. Patrick Shaughnessy – June 10, 2015**

  On June 10, 2015, Dr. Shaughnessy completed a questionnaire at the request of plaintiff's

counsel.  (Tr. 702-704)  Dr. Shaughnessy noted the diagnoses of lumbar stenosis with

radiculopathy causing leg pain, consistent with physical examinations and MRI findings.  He

wrote that Sistrunk experienced increased low back pain and weakness into the legs with

walking.  He stated that Sistrunk had limited activity tolerance and recommended no bending or

lifting and limited standing and walking.  (Tr. 702)  Dr. Shaughnessy opined that Sistrunk was

able to lift ten pounds occasionally and zero pounds frequently.  He limited his standing and

walking to a total of 2 hours in an 8 hour workday and 15 minutes without interruption.  (Tr.

703)  Sitting was limited to 6 hours and for 1 hour without interruption.  Dr. Shaughnessy opined

that Sistrunk could never climb, balance, stoop or crawl.  He could occasionally crouch, kneel

and reach with his arms.  He could only occasionally push/pull and should not be exposed to

hazards such as heights, moving machinery and vibration.  (Tr. 704)  Dr. Shaughnessy opined

that Sistrunk would miss work more than three times a month due to his impairments.  (Tr. 705)

### 2.    Consulting Physician – Eulogio Sioson, M.D. –January 2012

Sistrunk met with Eulogio Sioson, M.D., for a consultative exam on January 23, 2012.

Sistrunk reported that his medical problems included back and joint pains.  He said that his low

back pains went down his left hip and knee and started five years ago.  He had pain with walking

a block, standing for five minutes, and sitting for 15 minutes.  He reported doing laundry,

cooking and washing dishes.  He said he was able to dress, groom, shower, button, tie, and grasp.

Sistrunk denied any numbness in his legs.  (Tr. 503)

Dr. Sioson observed that Sistrunk walked normally with no assistive device.  He declined

to heel/toe walk and to squat, but he was able to get up and down on the examination table.  (Tr.

503)  Dr. Sioson noted tenderness in Sistrunk's left shoulder, right wrist, left hip, and left knee,

but no effusion, edema or gross instability.  (Tr. 504)  Seated straight leg raising was negative;

while supine leg raising was 30° on the right leg and 20° on the left.  (Tr. 504)  Manual muscle

testing showed mostly normal strength but 4/5 strength on the left hip flexors and extensors as

well as with knee flexion and extension and the left shoulder.  Sistrunk had no muscle atrophy.

(Tr. 504-505)  Dr. Sioson noted decreased range of motion in Sistrunk's lumbar region and in

both hips.  (Tr. 507)  Dr. Sioson's impression was back/joint pain, numbness of left 4th and 5th

fingers of unclear etiology, and a history of left eye injury.  (Tr. 504)

### 3.    Consulting Physician – Harvey Lester, M.D. – July 2012

Harvey Lester, M.D., performed an ophthalmologic consultative exam for DDS on July

23, 2012.  (Tr. 519-521)  Dr. Lester noted that Sistrunk exhibited light perception only in the left

eye, with visual acuity measured at 20/800.  The right eye measured 20/70 with best correction.

(Tr. 519)

#### 4.    Reviewing Physician – Diane Manos, M.D. – August 2012

On August 27, 2012, state agency reviewing physician, Diane Manos, M.D., reviewed Sistrunk's file and opined that he could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours, and sit for 6 hours in an 8-hour workday.  (Tr. 265) He could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Tr. 266)  She opined that Sistrunk should avoid all exposure to hazards.  (Tr. 268)

### D.    Testimonial Evidence

#### 1.    First Administrative Hearing – June 12, 2013

At the first hearing held before ALJ Giuffre, Sistrunk testified that he had graduated from high school and completed two months of a vocational training for electronic technicians.  (Tr. 185)  Sistrunk worked at the Zircoa Company for several years.  At first he worked as a press operator and then in maintenance.  (Tr. 186)  Later, he transferred to the "BGM Department" and operated a mixing machine.  (Tr. 187)  He operated forklifts, both standing and sitting types. (Tr. 190)  He also worked in the packing department.  (Tr. 192)  His work at Zircoa required standing most of the time.  (Tr. 189)  Many of the Zircoa jobs involved heavy lifting.  One involved rolling 40 to 50 gallon drums on and off of lifting and loading machinery.  (Tr. 190) Sistrunk lost his job at Zircoa due to drug use.  (Tr. 204)  After his Zircoa firing, Sistrunk worked for two days in a restaurant.  He was unable to continue this work due to increased back pain. (Tr. 196)

Sistrunk cared for his mother from 2006 to 2011.  (Tr. 204)  He helped her with walking, taking showers, and cooking.  While doing household tasks he would frequently sit for breaks and did laundry in several stages.  (Tr. 206)

Sistrunk cut his eye on a window rim in 8th grade and needed surgery.  He could only see shapes and colors out of his left eye.  (Tr. 197)  He no longer drove.  He did not renew his driver's license in 2006 due to child support issues.  (Tr. 198)

Sistrunk spent much of his time sitting around or making meals.  (Tr. 200-201)  He was able to shave, take a shower, cook and do dishes, but required frequent breaks.  (Tr. 201)  He went to the doctor's office, church and grocery shopping.  (Tr. 201-202)  He had trouble walking due to back pain and his leg giving out.  (Tr. 202)  Sistrunk said he could lift 10 to 15 pounds. (Tr. 203)  He first sought treatment for his back in April 2011.  Injections helped for a few days. He had gained weight due to inactivity.  (Tr. 209)

Vocational Expert Ted Macy also testified at the first hearing.  (Tr. 211-215)  Because Sistrunk raises no issue concerning the first-hearing VE testimony, it is unnecessary to summarize it here.

### 2. Second Administrative Hearing – May 27, 2015

Much of Sistrunk's testimony at the second hearing was similar to his testimony at the first hearing.  He also testified that his condition had gotten worse since the first hearing.  (Tr. 160-161)  He was having trouble sleeping, was unable to sweep, and was using much more effort and time to shower.  (Tr. 161)  Sistrunk's pain was in his lower middle back all the way down to his leg.  (Tr. 162)  He experienced pain every day and was taking pain medication.  His weight was up to 317 pounds (Tr. 164) and was impacting his pain, his ability to walk, and performance of his daily activities.  (Tr. 171)

Vocational Expert Kevin Yi testified at the second hearing.  (Tr. 172-178)  The VE classified Sistrunk's past work as material handler and working ceramic plant.  (Tr. 173-174)  In response to the ALJ's hypothetical question, the VE opined that such a person could not perform

any of Sistrunk's past jobs.  However, he would be able to perform the jobs of housekeeping

cleaner, produce sorter and merchandise marker.  The VE acknowledged that his testimony was

not consistent with the Dictionary of Occupational Titles ("DOT") in regard to the restriction of

occasional feeling with the left upper extremity.  He recognized that the DOT provided that the

jobs of produce sorter and merchandise marker required frequent feeling.  However, he noted

that the DOT did not differentiate between restrictions to one hand as opposed to both.  (Tr. 177)

## IV.    The ALJ's Decisions

The ALJ issued an unfavorable decision on August 9, 2013.  (Tr. 271-283)  Following a

request for review, the Appeals Council vacated the August 9, 2013 decision and remanded the

matter for further proceedings by order of February 9, 2015.  (Tr. 287-291)  Judge Giuffre held a

second administrative hearing and issued another decision on July 1, 2015.  The second decision

stated, in relevant part:

3.  Sistrunk had the following severe impairments: degenerative disc disease, loss
    of visual acuity, and obesity.  (Tr. 13)

4.  Sistrunk did not have an impairment or combination of impairments that met
    or medically equaled the severity of one of the listed impairments.  (Tr. 14)

5.  Sistrunk had the residual functional capacity to perform light work except he
    could only occasionally climb ramps and stairs, stoop (i.e. bending at waist),
    kneel, and crouch (i.e. bending at the knees).  He could never climb ladders,
    ropes, and scaffolds, balance, or crawl.  He could only occasionally use the left
    upper extremity for feeling.  He could perform work that did not require
    normal far acuity, depth perception or field of vision in both eyes.  He must
    avoid all exposure to hazards such as industrial machinery and unprotected
    heights, etc.  (Tr. 15)

10. Considering Sistrunk's age, education, work experience and residual
    functional capacity, there were jobs existing in significant number in the
    national economy that the claimant could perform.  (Tr. 20)

Based on her twelve findings, the ALJ determined that Sistrunk had not been under a disability

from February 1, 2007 through the date of the decision.  (Tr. 21)

13

## V.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d

742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the Commissioner determines whether or not the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other

jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B.     Treating Physician Rule[1]

Sistrunk argues that the ALJ failed to properly evaluate the opinions of treating source Dr. Shaughnessy. The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Even if the ALJ does not give the opinion controlling weight, the opinion is still entitled to significant deference or weight which takes into account the length and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)(6). The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ( ("In addition to balancing the factors to determine what weight to give a treating source opinion [when controlling weight has been denied,] the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the

---

[1] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. See 20 C.F.R. § 416.927. Sistrunk filed his claim before the revision took effect.

weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

ALJ Giuffre's entire discussion of Dr. Shaughnessy's opinion was as follows:

> The undersigned has considered and gives little weight to the Pain Questionnaire Report dated June 10, 2015 by Patrick Shaughnessy, M.D. He opined the claimant could lift and carry 10 pounds occasionally and no weight frequently. He could stand and walk for two hours (one quarter hour at a time) in an eight hour workday. He could sit six hours (one hour at a time) in an eight hour workday. He could never climb, balance, stoop, and crawl. He could occasionally crouch and kneel. Reaching, pushing, and pulling were affected by his impairment. He was restricted from heights, moving machinery, and vibration. He would be absent from work more than three times monthly because of his impairments or treatment. (Ex. 9F). The undersigned also notes Dr. Shaughnessy examined the claimant January 7, 2015 at pain management. He noted the claimant was not able to work in a competitive work setting. (Ex. 8F, p. 63) The treatment records do not show the type of treatment one would receive as a totally disabled individual. His treatment had been conservative with pain medication, physical therapy, and spinal injections. The recommendations were for weight loss and exercise.

(Tr. 19)

The ALJ may assign less than controlling weight to the treating physician's opinion if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and

if it is inconsistent with the other substantial evidence in [the] case record. If the ALJ makes these findings, she must still take into account the length and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. She must provide good reasons for assigning less than controlling weight to the treating physician's opinion.

Here, the ALJ's only reason for assigning little weight to Dr. Shaughnessy was that Sistrunk had received only conservative treatments for his condition. It is not possible to tell from the ALJ's decision whether she took into account the length of the treatment relationship, the supportability or the consistency of his opinion or whether Dr. Shaughnessy was a specialist. She cited no evidence in the record that contradicted Dr. Shaughnessy's opinion or that indicated his opinion was not based on acceptable clinical and laboratory techniques. Dr. Shaughnessy's report, on the other hand, stated that he based his opinions on his clinical findings and the results of MRI analyses. The ALJ failed to point to "evidence in the case record, *** sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).

The ALJ rejected Dr. Shaughnessy's opinion because she felt that his treatment was inconsistent with that of "a totally disabled individual." However, she did not describe the alternative treatment she believed such an individual would have received. And she chose not to bring in a medical expert to describe such treatments. The record showed that Sistrunk had been treated for his back pain for many years. He had undergone physical therapy, osteopathic manipulation, spinal injections and medication. (Tr. 608, 623, 627) Dr. Shaughnessy

recommended surgery, but he also expressed doubt that Sistrunk was a surgical candidate. (Tr. 666) It is unclear how Sistrunk's conservative treatment was a proper ground for rejecting his treating physician's opinion given the apparent inefficacy of the various treatments that had been attempted and given the doubtful availability of a surgical correction.

The ALJ did accurately note that Dr. Shaughnessy had recommended weight loss and exercise. However, as noted in the medical history above, these were not the only treatments Sistrunk tried. And the record contains evidence that Sistrunk's attempts to comply with an exercise regimen had failed because of his pain. (Tr. 582, 664)

The Commissioner argues that the ALJ made factual findings elsewhere in her opinion supporting her decision to reject the opinion of Dr. Shaughnessy. The Commissioner points to some of this evidence arguing that the ALJ rejected Dr. Shaughnessy's opinion based on this evidence. ECF Doc. 14, Page ID# 796-770. But the ALJ did not cite any specific evidence in the record supporting her decision to reject the opinion of Sistrunk's treating physician. Thus, the Commissioner's argument is merely "post-hoc gloss on the ALJ's decision." *See Camacho v. Comm'r Soc. Sec.,* No. 1:17-cv-222, 2017 U.S. Dist. LEXIS, 205873 (Dec. 5, 2017). Such post-hoc argument is unavailing.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion is harmless error. These circumstances arise when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation. "*Wilson,* 378 F.3d at 547. *See also Cole,* 661 F.3d at 940. In the last of these

circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. App'x 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010). "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. App'x at 551.

Here, the ALJ's recitation of the medical evidence with very little analysis did not provide an understanding of the reasons for the weight she assigned to Dr. Shaughnessy's opinion. She failed to point to any specific records supporting her finding. She merely asserted that Sistrunk's treatment had been too conservative, without any citation to medical evidence supporting that conclusion. This gives the impression that the ALJ simply substituted her own opinion for that of the treating physician. The court cannot determine whether the ALJ fully considered the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6) including whether the medical evidence in the record as a whole supported Dr. Shaughnessy's opinions. The ALJ's failure to provide sufficiently specific "good reasons" for rejecting Dr. Shaughnessy's opinion regarding Sistrunk's limitations was not harmless error. Even if good reasons existed to reject the treating physician's opinion, the ALJ failed to articulate those reasons with sufficient specificity to allow for meaningful review. The ALJ's decision must be remanded for further proceedings.

**C.     Listing 1.04**

Sistrunk also contends that the ALJ erred in finding that the evidence did not meet

Listing 1.04.  Sistrunk points to specific evidence in the record arguing that he has met each of

the requirements of the Listing.  Sistrunk also argues that the ALJ improperly determined –

because his medical history failed to show muscle atrophy – that he did not meet the Listing.

Sistrunk contends that he was not required to show atrophy and that muscle weakness alone

satisfied the "motor loss" component of Listing 1.04.  ECF Doc. 13, Page ID# 778.

Listing 1.04 governs disorders of the spine and requires that the spinal condition result

"in compromise of a nerve root . . . or the spinal cord."  20 C.F.R. Part 404, Subpart P, Appendix

1, § 1.04.  Additionally, there must be:

> A.  Evidence of nerve root compression characterized by neuro-anatomic
>     distribution of pain, limitation of motion of the spine, motor loss (atrophy with
>     associated muscle weakness or muscle weakness) accompanied by sensory or
>     reflex loss and, if there is involvement of the lower back, positive straight-leg
>     raising test (sitting and supine);

*Id*.  Thus, to satisfy Listing 1.04(A), Sistrunk was required to demonstrate compromise of a

nerve root or spinal cord and: (1) neuro-anatomic distribution of pain; (2) limitation of motion of

the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness); (4)

sensory or reflex loss; and (5) positive straight leg raise test, in both the sitting and supine

positions.  In addition, the regulations require that the abnormal findings must be established

over a period of time: "Because abnormal physical findings may be intermittent, their presence

over a period of time must be established by a record of ongoing management and evaluation."

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(D).

The ALJ considered Listing 1.04(A) but found it was not met because the record did not

establish "the presence of a compromised nerve root or spinal cord and; (A) evidence of nerve

root compression characterized by neuro-anatomic distribution of pain, limitation of motion of

the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, positive straight-leg raising or; (B) spinal arachnoiditis; or (C) lumbar spinal stenosis resulting in pseudoclaudication." (Tr. 14) Essentially, the ALJ simply restated the requirements of the Listing, albeit with an error in her description of "motor loss." Her analysis of this Listing was lacking.

In *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011), the ALJ determined that the claimant did not have an impairment that met or equaled any of the impairments listed in Section 1.00 of the Listings without actually evaluating the evidence and giving an explanation for his conclusion. The Sixth Circuit determined that, without a reasoned explanation, the ALJ's decision precluded meaningful judicial review and was not supported by substantial evidence. *Id.* at 416.

Since *Reynolds*, the Sixth Circuit has expressly declined to adopt a blanket rule that remand is required whenever an ALJ provides minimal reasoning at Step Three of the sequential evaluation process. *See Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359 (6th Cir. 2014). In *Forrest*, the ALJ found at Step Three only that the plaintiff's impairments did not meet or medically equal the severity of a listed impairment. *Id.* Despite his "sparse analysis," the Sixth Circuit affirmed the ALJ's Listings finding because he "made sufficient factual findings elsewhere in his decision to support his conclusion at [S]tep [T]hree." *Id.* at 366 (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (looking to findings elsewhere in the ALJ's decision to affirm a Step-Three medical equivalency determination, and finding no need to require the ALJ to "spell out every fact a second time'); *Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 417 (6th Cir. 2014) (Moore, J., dissenting) (acknowledging that an ALJ's Step-Three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for

the ALJ to support his findings by citing an exhibit when the exhibit contained substantial evidence to support his conclusion) (emphasis in original)).

The Sixth Circuit also found that even if the ALJ's Step-Three finding lacked adequate support, the error was harmless because the plaintiff had not shown that his impairments met or medically equaled in severity any listed impairment. *Id.*, citing *Reynolds,* 424 F. App'x at 416 (ALJ erred by providing no reasons to support his finding that a specific listing was not met, and error was not harmless because claimant had possibly put forward sufficient evidence to meet the Listing); *Audler v. Astrue*, 501 F.3d 446, 448-49 (5th Cir. 2007) (lack of Step-Three explanation was not harmless when claimant carried her burden of showing she met a listing)). *See also Joyce v. Comm'r of Soc. Sec.*, 662 F. App'x 430, 435 (6th Cir. 2016) (harmless error found when ALJ's rejection of listing-level IQ score as inconsistent with record evidence was supported, which necessarily precluded finding that plaintiff met requirements of Listing 12.05(C)); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016) (record evidence sufficient to support ALJ's conclusion that the plaintiff did not meet requirements of Listing 12.05(C)).

Here, as in *Forrest*, the ALJ's explanation of her Listing finding was sparse. Thus, the question becomes whether findings elsewhere in her decision and the record evidence were sufficient to support her conclusion. They were.

Sistrunk points to certain pieces of evidence arguing that they supported a finding that he met Listing 1.04. He states,

> * * * he has nerve root impingement with L4 nerve root compression "suspected" (Tr. 697) and a neuroanatomic distribution of pain, as per Dr. Shaughnessy, (Tr. 654) as well as decreased lumbar range of motion on multiple examinations (Tr. 507, 653). Three separate doctors over a three-year period have documented lower extremity muscle weakness (i.e. motor loss), beginning with Dr. Sioson in 2012 (Tr. 505), and by Drs. Tracey (Tr. 628) and Shaughnessy (Tr. 644) in 2014. Plaintiff has documented sensory loss in the left lower extremity as well. (Tr. 628, 644) Dr. Shaughnessy notes that this is in an S1 distribution. (Tr. 644) Dr.

Shaughnessy also has documented decreased reflexes in the ankles. (Tr. 653) Plaintiff was found to have a positive straight leg raising test on the left. (Tr. 143) Thus, he meets all of the criteria of Listing 1.04(A).

The flaw in Sistrunk's argument is that "only occasional or intermittent findings" of the Listing 1.04 requirements are insufficient. *See Brauninger v. Comm'r of Soc. Sec.,* No. 1:16-cv-926, 2017 U.S. Dist. LEXIS 182775, at *21 (S. Dist. Ohio Nov. 3, 2017); *See also, Irvin v. Comm'r of Soc. Sec.,* No. 1:12-cv-837, 2013 U.S. Dist. LEXIS 93521 at *10 (S.D. Ohio July 3, 2013); (Black, J., citing *Bailey v. Comm'r of Soc. Sec.*, 413 Fed. Appx. 853, 854 (6th Cir.2011)); accord *Easley v. Comm'r of Soc. Sec.,* No. 3:11-cv-377, 2012 U.S. Dist. LEXIS 110255, 2012 WL 3238047 (S.D. Ohio Aug. 7, 2012) (affirming ALJ's conclusion that Plaintiff did not satisfy Listing 1.04, when medical evidence was inconsistent, and several studies suggested nerve root involvement or irritation, not nerve root compression); *Franks v. Comm'r of Soc. Sec*, No. 1:06-cv-810, 2009 U.S. Dist. LEXIS 84467, 2008 WL 648719 at*6 (S.D. Ohio March 10, 2008) (affirming ALJ finding that evidence did not show required abnormal sensory, reflex or motor loss, when plaintiff pointed to evidence of each "in certain instances," but evidence failed to show that such findings persisted over time).

Sistrunk focuses on the ALJ's erroneous implication that finding motor loss required a showing of atrophy. Sistrunk correctly points out that he could show motor loss by evidence of muscle weakness alone. Even if it is assumed he could make that showing, some of the other evidence Sistrunk cites in support his Listing 1.04 claim is equivocal or inconsistent. For example, the 2014 MRI of Sistrunk's lumbar spine showed degenerative changes with "suspected" encroachment of the left L4 nerve root. The ALJ referred to this finding in her Step Five analysis. (Tr. 18) This evidence is equivocal and does not necessarily support a Listing

1.04 finding.  And this is the only evidence Sistrunk cites to support his argument that the nerve root compression requirement of the Listing had been met.

Another example showing inconsistency in the record relates to the requirement that Sistrunk show positive straight leg raise test, in both the sitting and supine positions.  Sistrunk points to one positive straight leg raise test on the left from a physical examination on January 5, 2015.  This finding came shortly after Sistrunk fell and had additional acute pain.  (Tr. 143)  The ALJ acknowledged this positive straight leg raise test in her decision.  (Tr. 18)  But, she also highlighted that this same finding was not repeated two days later at a January 7, 2015 examination.  (Tr. 18)  In fact, the January 7, 2015 treatment note states that "straight leg raising in the sitting and supine positions is negative."  (Tr. 682)  Thus, Sistrunk has not down that the evidence consistently showed positive straight leg raise testing in the sitting and supine positions.

The ALJ could have provided a better explanation for her finding that Sistrunk did not meet Listing 1.04.  However, if anything, her sparse explanation was harmless error.  Statements found elsewhere in her decision and evidence in the record substantially support a finding that Sistrunk does not meet Listing 1.04.  For this reason, Sistrunk's second argument provides no basis for remand of the Commissioner's decision at Step Three of the sequential analysis.

## VI.    Conclusion

The ALJ's decision and the record evidence supported the Commissioner's Step Three finding.  The court overrules Sistrunk's argument on that point and concludes it provides no basis for remand.  However, because the ALJ did not correctly apply the applicable legal standards in the handling of Sistrunk's treating source opinions and because her reasoning did not build an accurate and logical bridge between the evidence and the results of her decision at

Step Five, the final decision of the Commissioner is VACATED and the case is REMANDED

for further proceedings consistent with this opinion.

   IT IS SO ORDERED.


Dated: June 26, 2018

Thomas M. Parker
United States Magistrate Judge